UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) 1:10-cr-00150-JAW |
| | ) |
| MARK STEPHEN PALMQUIST, | ) |
| | ) |
| Defendant. | ) |

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

Mark Palmquist moves to suppress any evidence relating to statements he made during an interview with Timothy R. Bond, special agent for the United States Department of Veterans Affairs, Office of the Inspector General. He also seeks to suppress any "fruits" or leads resulting from the interview. Palmquist's arguments center on the belief that any statements he made to Bond were immunized in accordance with the rule set forth in Garrity v. New Jersey, 385 U.S. 493 (1967), because Palmquist was an employee of the Department of Veterans Affairs at the time he made the statements and he was compelled to speak or risk possible disciplinary action in conjunction with exercising his right to remain silent. Concluding that Palmquist's arguments fail based upon the facts of this interview and the applicable law, I recommend that the court adopt the following proposed findings of fact and deny the motion to suppress.

### PROPOSED FINDINGS OF FACT

Timothy Bond, a criminal investigator with the Department of Veterans Affairs for twenty-one years, began his investigation of Mark Palmquist sometime prior to February 11, 2009, because the Department's anonymous hotline received a "tip" and Earl Hutchinson, a services manager for the VA in Boston, Massachusetts, also made an independent referral.[1] On

---
[1] Mr. Hutchinson is not in Palmquist's supervisory chain of command.

April 3, 2009, Agent Bond traveled to the Togus Veterans Hospital in Augusta, Maine, to interview Palmquist. He sought and obtained the assistance of Jeffrey Turner, a law enforcement officer at Togus, before conducting the interview. Officer Turner escorted Agent Bond to Palmquist's office, where Palmquist was interviewing patients in connection with his role as a patient advocate for the facility. Bond requested that Turner remain during the interview to serve as a witness. Turner's role was simply to assist Bond in making the introductions, because Turner was familiar with Palmquist, and in witnessing the interview in order to corroborate Bond's version of events.

Turner and Bond entered Palmquist's office and Bond informed Palmquist that he was a criminal investigator conducting an investigation into Palmquist's receipt of dependency benefits. Bond displayed his credentials. Palmquist already knew that Turner was a law enforcement officer at the facility. The interview was not previously scheduled and Palmquist apparently did not know the nature of the inquiry other than that, according to Bond's statement, it pertained to his receipt of compensation in the form of veteran's benefits for his dependents. Both officers were calm and polite during the interview. With Palmquist's acquiescence, Bond closed the door for greater privacy because there were patients in an adjacent room waiting to speak with Palmquist. The interview was not recorded.

Bond brought with him a form that he always uses when conducting interviews of government employees. The form contains an advisement of rights that purports to comply with the Garrity case. According to Bond, VA investigators are required to use the form whenever there is a criminal investigation involving an employee, whether or not the investigation relates to that employee's official duties. Bond summarized the form for Palmquist, but did not read it verbatim, and then gave the form to Palmquist to read. At no time in his summary did Bond

2

mention anything about statements or silence being used in administrative proceedings. Nor did Bond suggest in any way that Palmquist was being investigated in connection with employment-related activity. There was no discussion at all about employment-related administrative proceedings.

What Bond did say is that he was conducting a criminal investigation related to Palmquist's receipt of VA dependency benefits. Bond advised Palmquist that he did not have to answer any questions and could not be fired for choosing not to answer. Thereafter, Bond supplied Palmquist with Exhibit 1,[2] the written advisement of rights form, telling Palmquist that the form supplied additional detail about Palmquist's rights and that he should take his time and read the form carefully, ask questions if he had any, and sign if he agreed to participate in the interview. Palmquist did not take any significant time to review the form and, based on Bond's testimony, Palmquist merely glanced over the form.

>The VA-Office of Inspector General's <u>Garrity</u> form states:
>
>You are being contacted to solicit your cooperation in an official investigation regarding misconduct or improper performance of official duties. . . .
>
>The matter under investigation could constitute a violation of law that could result in the criminal prosecution of the responsible individuals.

The form then states: "This inquiry concerns" and provides a blank to fill in. In this blank, Agent Bond wrote: "VA compension [sic] benefits for Mark Palmquist." Beneath the blank section the form continues:

>You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time.
>
>Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you.

---

[2] Agent Bond identified Exhibit 1 on direct examination by the Government but it was Palmquist who moved for its admission during cross-examination.

> If you refuse to answer the questions posed to you on the grounds that the answers may tend to incriminate you, you cannot be removed (fired) solely for remaining silent; however, your silence can be considered in an administrative proceeding for any evidentiary value that is warranted by the facts surrounding your case.

Finally, the form contains an "Acknowledgment" section, which states:

> I understand the warnings and assurances stated above and I am willing to make a statement and answer questions voluntarily. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

After Palmquist quickly looked at the Garrity form, he indicated he understood his rights and was willing to proceed with an interview. He signed the form. Palmquist began the interview by telling Bond about the medical issues associated with his claim for VA benefits. Agent Bond indicated that the matter under investigation concerned the number of dependents for whom Palmquist was claiming benefits. Palmquist then stated that he had a civil suit pending against the VA and told Bond that David Webbert was his lawyer in connection with the lawsuit. Palmquist showed Bond a copy of a pleading, which Bond quickly scanned. Bond assured Palmquist that his questions had nothing to do with the lawsuit,[3] but indicated to Palmquist that since he had mentioned that he had an attorney, he could have the attorney present for the interview if he chose to do so. Palmquist agreed with Bond that the interview had nothing to do with his employment discrimination suit and he agreed to answer questions relating to the dependency benefits investigation.

Bond was aware that Palmquist had a minor criminal record for matters involving a domestic assault and some type of criminal threatening case. Bond also knew that Palmquist had a master's degree in public administration and worked in a demanding job as a patient advocate for veterans receiving health care benefits. Bond conducted the interview in a cordial fashion

---

[3] The lawsuit concerned inappropriate actions by a supervisor when Palmquist worked at Iron Mountain, Michigan.

and at its conclusion everyone shook hands and Bond thanked Palmquist for his cooperation. Bond and Turner departed and Bond subsequently provided Turner with a copy of his typed report. Turner did not produce a report of the investigation.

The record includes additional exhibits consisting of a May 6, 2005, memorandum of Assistant Attorney General Christopher Wray concerning "Garrity and Kalkines warnings" (Doc. No. 15-2) as well as "Warning and Assurances" forms recommended by AAG Wray for use as advice of rights forms by the Offices of Inspector General when interviewing federal employees (Doc. Nos. 15-3, 15-4). The VA-Office of Inspector General form (Exhibit 1) is different from the forms recommended by AAG Wray.

## DISCUSSION

Palmquist maintains that Agent Bond placed him "in a position of having to choose between answering questions in a criminal investigation or invoking his Fifth Amendment rights and having his silence used against him in a disciplinary proceeding." (Mot. to Suppress Statements at 1, Doc. No. 15.) According to his memorandum: "Faced with the prospect that his silence would be used against him in an administrative proceeding, [he] agreed to answer Mr. Bond's questions." (Id. at 3.) Because he participated in the interview, Palmquist asserts that his statements are now immunized pursuant to Garrity v. New Jersey and its progeny. (Id. at 1.)

The burden is on the United States to prove, by a preponderance of the evidence, that the defendant's statements were voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972). The United States must show that, based on the totality of the circumstances, the investigating agents did nothing to break or override the defendant's will, Chambers v. Florida, 309 U.S. 227, 240 (194), and that his statements were "the product of a rational intellect and a free will," Blackburn v. Alabama, 361 U.S. 199, 208 (1960). See also Lynumn v. Illinois, 372 U.S. 528, 534 (1963).

5

The rule of the Garrity opinion is that a government employee who faces job forfeiture if he exercises the Fifth Amendment right to silence in an investigation of official misconduct is subject to a form of inherent coercion, making any resulting confession involuntary as a matter of law. Garrity v. New Jersey, 385 U.S. 493, 497-98 (1967). The question posed by the Garrity Court, and answered in the negative, was "whether a State . . . can use the threat of discharge to secure incriminatory evidence against an employee." Id. at 499. The Court framed its holding in the following terms: "We now hold the protection of the individual . . . against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." Id. at 500; see also id. at 498 ("Where the choice is 'between the rock and the whirlpool,' duress is inherent . . .") (quoting Frost & Frost Trucking Co. v. R.R. Comm'n of Cal., 271 U.S. 583, 593 (1926)).

The First Circuit Court of Appeals has observed that the holding of Garrity will not support the suppression of incriminating statements where the government employee "was not subject to automatic loss of her position if she asserted her right not to testify." United States v. Stein, 233 F.3d 6, 16 (1st Cir. 2000). A mere concern for the potential negative administrative consequences of maintaining silence is not the kind of coercive penalty that the Garrity rule addresses. Id. For example, the First Circuit has "held that a state police officer's self-incriminating statements made during a theft investigation were not coerced, where nothing in relevant police department rules mandated dismissal for invoking Fifth Amendment rights." Id. In United States v. Indorato, 628 F.2d 711 (1st Cir. 1980), the Court observed that two common features should be present before suppression of statements is warranted under Garrity: "(1) the person being investigated is explicitly told that failure to waive his constitutional right against

6

self-incrimination will result in his discharge from public employment . . . ; and (2) there is a statute or municipal ordinance mandating such procedure." Indorato, 628 F.2d at 716. If a federal government employee faces the prospect of either being dashed against the rock of termination or drowned in the whirlpool of self-incrimination and chooses to provide statements to the authorities, then the United States is precluded from using the statements or their fruits in a subsequent criminal proceeding against the employee. Sher v. United States Dep't of Veterans Affairs, 488 F.3d 489, 501 (1st Cir. 2007) (discussing the interrelation of Garrity and Gardner v. Broderick, 392 U.S. 273, 278 (1968)).

The United States asserts that Palmquist cannot take any benefit from the Garrity rule in this case because there is no law or regulation that threatened job termination if he refused to participate in the interview with Agent Bond. (Response at 1, Doc. No. 24.) The United States is correct. Garrity does not call for a suppression remedy in this scenario because Palmquist did not face job loss or another significant adverse employment action if he refused to participate in the interview. Palmquist argues that this is not clear, citing 38 C.F.R. § 0.735-12(b), which warns that a Veterans Affairs employee who refuses to testify "in cases respecting employment and disciplinary matters" may be subject to "disciplinary action." (Mot. to Suppress at 6, 9.) However, Agent Bond was not investigating Palmquist for official misconduct or in relation to employment and disciplinary matters. Agent Bond's investigation concerned potential fraud in Palmquist's own VA benefits claims, which allegedly sought enhanced payments to Palmquist's account based on his purported support of persons who were no longer his dependents. In this scenario, Agent Bond appropriately advised Palmquist that he could not be fired solely for refusing to participate in an interview.

7

Aside from the appropriateness of Agent Bond's spoken warning, Palmquist seeks to advance his cause based on the language contained in the written advisement of rights that he signed. He highlights the fact that the form suggests both the existence of an investigation concerning official misconduct and the prospect that his silence could be considered in an administrative proceeding, even if it could not serve as an independent basis for his removal from office. Assuming for the sake of argument that Palmquist scrutinized every word of the written advisement, he would have learned that any statement he gave could be used against him in a criminal proceeding or in an administrative proceeding, but that his refusal to answer questions for fear of self-incrimination could not serve as an independent ground for removal from employment. This scenario would not offend the Garrity rule because it did not threaten termination or an adverse employment action as a consequence of refusing to answer questions and no statute or regulation mandated such a result. If the Office of the Inspector General had required Palmquist to answer questions or else suffer termination or another significant adverse employment action, this would be a different case.

Palmquist's motion to suppress is premised entirely on the legal principle set forth in Garrity v. New Jersey. In the absence of a sufficient factual basis to justify a finding of *de jure* coercion under Garrity, the record lacks any colorable basis, let alone argument, for finding that Agent Bond subjected Palmquist to a coercive investigative interview.

## CONCLUSION

For the reasons set forth above, Palmquist's responses to Agent Bond's questions were not immunized by operation of the rule set forth in Garrity v. New Jersey. In the absence of *de jure* coercion, there is no legal or factual basis in the record to regard Palmquist's statements as "involuntary" for Fifth Amendment purposes.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

February 8, 2011